

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable George H. Sheppard
Comptroller of Public Accounts
Austin, Texas

Dear Sir:

Opinion No. O-3049
Re: Accrual of tax levied by
Article 7047(41.a), Vernon's
Annotated Revised Civil Stat-
utes of Texas, upon the sale
of cement to contractor under
a "cost-plus-afixed-fee" con-
tract with the War Department
for the construction of a Tol-
uol and Explosive plant at Bay-
town, Texas.

By your letter of January 17, 1941, you direct our
attention to copy of a letter to you from the Lone Star Cement
Corporation, under date of November 28, 1940, wherein the fol-
lowing four questions upon the above subject are stated:

"Our Mr. A. C. Connolly talked with your
Mr. J. W. Byrne in regard to the application
of the state tax on cement to a certain class
of shipment. Mr. Byrne requested that we submit
this question in writing.

"The Humble Oil & Refining Company have entered
into a contract with the War Department for the con-
struction of a Toluol and Explosive Plant at Baytown,
Texas. This contract provides that the plant is to
be built and operated by the Humble Oil & Refining
Company on a cost-plus-afixed-fee basis, with the
title to the plant remaining in the hands of the Fed-
eral Government. In looking over this contract we
find it to contain the following provisions:

"'Article 7-B: Ownership-- The title to all
work, completed on the course of construction

under Title II, shall be in the Government. Likewise, upon delivery at the site of the work or at an approved storage site and upon inspection and acceptance in writing by the Contracting Officer, title to all materials (except prime out naphtha supplies and by-products to be returned to the contractor's refinery), tools, machinery, equipment and supplies, for which the contractor shall be reimbursed under Title IV shall vest in the Government. These provisions as to title being vested in the Government shall not operate to relieve the contractor from any duties imposed under the terms of this contract. '

"This Article 7-B indicates that the Humble Oil & Refining Company are simply acting as agents of the Federal Government and provision has been made for the title of all materials to pass directly from the hands of the shipper to the Federal Government. If the Humble Oil & Refining Company purchased the cement for this project it seems quite evident that the tax on cement would not apply on these shipments.

"Since being awarded the contract the Humble Oil & Refining Company have entered negotiations and awarded private contracts to three separate contractors to do the actual construction and to purchase all materials required for this construction. It would seem that in this instance these contractors are acting as agents of the Humble Oil & Refining Company, who are in turn agents of the Federal Government. For this reason it would seem that the tax would not apply on this cement.

"There is another possibility in connection with the purchase of materials and that is the contractors might purchase ready-mix concrete instead of cement, sand and gravel. In this case our sale would be to the ready-mix operator, who in turn would mix the cement with sand, gravel and water and sell to the contractor as ready-mix concrete.

"We would appreciate your advising us whether
we are correct in our interpretation that the tax would
not apply on shipments direct to the Humble Oil & Refining
Company or to the three contractors to whom they have
awarded contract for the actual construction. We would
also appreciate your advising us whether or not the tax
would apply on shipments to the ready-mix concrete com-
pany, who in turn uses the cement as an ingredient
in the processing of the concrete.

"The cement will no doubt be purchased for this
job at a very early date, as this represents part of
the National Defense program. We will, therefore,
appreciate your giving us the benefit of a ruling as
quickly as possible.

Very truly yours

s/ J. Bryan Oldham
Division Sales Manager

JBO:MP

"P.S. The Federal Government awarded a cost-
plus-a-fixed-fee-contract to the Consolidated Steel
& Iron Company to erect shipyards at Orange. The
Consolidated Steel ' Iron Company in turn awarded
private contract to a contractor to actually do the
work. The contract between the Consolidated Steel
& Iron Company and the Federal Government provides
that the title to the property and buildings re-
mains in the hands of the Federal Government but-
does not specifically provide that the title to the
materials is vested in the Federal Government. Please
advise whether or not the tax would apply on ship-
ments to the Consolidated Steel & Iron Company or
to the contractors on this project.

J.B.O."

Article 7047, Section 41a, Subsection A, Vernon's An-
notated Revised Civil Statutes of Texas, provides as follows:

"(a) There is hereby imposed a tax of one and
one-fourth (1¼¢) cents on the one hundred (100) pounds,

or fractional part thereof, of cement on every person
in this State manufacturing or producing in and/or im-
porting cement into this State, and who thereafter dis-
tributes, sells or uses the same in intrastate commerce.
Said tax shall accrue on and is imposed on the first
intrastate distribution, sale or use; provided, however,
no tax shall be paid except on one sale, distribution
or use. The person liable for said tax is hereby defined
to be a 'distributor.'"

Inasmuch as tax liability under the above levy hinges
upon whether the Humble Oil and Refining Company is an independ-
ent contractor with the Federal Government for the construction
of a toluol and Explosive Plant at Baytown, Texas, or only an
agent of the Government for the furnishing of materials and sup-
plies to this end, this Department, subsequent to your original
opinion request of November 25, 1940, sought and received a copy
of the contract entered into between said parties, for the pur-
pose of determining their exact relationship. This contract is
described as "Contract No. W-ORD-480" for "Emergency Plant Fac-
ilities and Cost-Plus-A-Fixed-Fee Construction, Equipment, and
Operation Contract," and was entered into on the 24th day of
October, 1940.

The general proposition that a state may not tax the
operations of an instrument or agency employed by the Federal
Government to carry its powers into operation is incontroverti-
ble, and requires no discussion here. The instant question in-
volves only a determination of whether or not the Humble Oil and
Refining Company is, under the aforesaid contract, constituted an
agency or instrumentality of the Federal Government so as to
clothe it, and those with whom it contracts for cement and other
materials, with this constitutional immunity from state taxation.

It is no longer necessary to be concerned with the
place where the cement is delivered for this construction job,
under the line of cases holding that the revenue and tax measures
of a state cannot reach into territory over which exclusive juris-
diction has been ceded to the United States by said state. This
question has been removed by the enactment of the so-called Buck
Act, Public No. 819, approved October 9,1940, and effective Jan-
uary 1, 1941, eliminating formerly existing territorial impediments

Honorable George H. Sheppard, page 5

to the imposition of excise taxes by the various states.

The specific contractual provisions, which, to our mind, constitute the Humble Oil & Refining Company an independent contractor with the United States of America, so as to be subject to all State and local taxation, rather than a mere agent or instrumentality of the Government, enjoying immunity from such taxation, are pointed out as follows:

In the introductory part of the described contract, the Humble Oil & Refining Company, referred to as "the Contractor," is described by the parties themselves as an "independent contractor" in the following recital:

"WHEREAS, the Government desires to acquire the site and to have the Contractor, acting as an independent contractor, design (including the plans for the installation of, and the installation of the equipment), construct, equip and operate a certain toluol plant at or near Baytown, Texas;"

Title II, Article II-A, Section 1, provides that:

"The Contractor shall, in the shortest reasonable time, furnish the labor, materials, tools, machinery, equipment, facilities, supplies not furnished by the Government, and services, and do all things necessary for the completion of the following work:"

In subdivisions (a) and (b) of the above Section I, it is provided that the Contractor shall "Construct and equip on said site, in accordance with the approved drawings, specifications, and instructions provided for herein, a plant for the manufacture of toluol * * *", "all architectural and engineering services covering the design, preparation of drawings, plans, specifications and field engineering and supervision necessary for the efficient execution and coordination of the work" to be furnished by the Contractor, subject to the approval of the Government. It is further provided that "the contractor shall obtain all necessary licenses, permits and approvals from all local, state and federal authorities, if obtainable."

Title II, Article II-D provides:

"The Contractor is hereby authorized to do all things necessary or convenient in and about the construction and equipment of the plant under this Title II, including the employment and discharge of all persons engaged in the work hereunder (who shall be subject to the control of and constitute employees of the Contractor or its subcontractors) and the acquisition and supply of all necessary materials. The contracting Officer may require the Contractor to dismiss from the work such employees as the Contracting Officer deems incompetent, or whose employment he deems not to be in the public interest, subject to appeal by the Contractor in accordance with Article VII-M of Title VII hereof for reinstatement of any such employee."

Title IV, Article IV-A, concerning "Reimbursement for Contractor's Expenditures," provides as follows:

"1. The Government shall bear all cost and expense of every character and description incurred by the Contractor, when approved or ratified by the Contracting Officer, in connection with the design, construction, equipping and operating of said Plant, or any part there of (including equipment, alteration, maintenance and closing down), which costs and expenses shall include but shall not be limited to the following items, to wit:

"(a) All labor or materials * * * tolls, machinery, equipment, designs, plans, supplies, services," * * *,"

"* * * *,

"(j) Premiums on such bonds and insurance policies as the Contracting Officer may require; the cost of all public liability, employer's liability, workmen's compensation, fidelity, fire, theft, burglary and other insurance that the Contracting Officer may approve as reasonably necessary for the protection of the Contractor.

Honorable George N. Sheppard, page 7

"* * *.

"(m)  Payments made by the Contractor under the social Security Act (employer's contribution) and any applicable State or local taxes, fees, or charges which the Contractor may be required on account of this contract to pay on or for any plant, equipment, process, organization, materials, supplies, personnel, permits, and license fees; and if approved in writing in advance by the Contracting Officer, royalties on patents used, including those owned by the Contractor."

Title IV, Article IV-A, Section 4, provides:

"4.  The Contractor shall, to the extent of its ability, take all cash and trade discounts, rebates, allowances, credits, salvage, commissions and direct bonifications, and when unable to take advantage of such benefits, it shall promptly notify the Contracting Officer to that effect and the reason therefor.  In determining the actual net cost of articles and materials of every kind required for the purpose of this contract, there shall be deducted from the gross cost thereof all cash and trade discounts, rebates, allowance, credits, salvage, commissions and direct bonifications which have accrued to the benefit of the Contractor."

(Our Note:  No deduction of taxes mentioned here in arriving at net reimbursable cost of materials, but rather the express assumption by the Government of such taxes on materials, by Section I, (m), of Article IV-A, next above quoted.)

Title VII, Article VII-E, Section 1, provides:

"The Contractor hereby agrees that it will:

"(a)  Procure and thereafter maintain such bonds and insurance in such forms in such amounts and for such periods of time as the Contracting Officer may approve or require.

"(b)  Procure all necessary permits and licenses; obey and abide by all applicable laws, regulations, ordinances and other rules of the United States of America, of the State, Territory or sub-division thereof wherein the work is done, or of any other duly constituted public authority.

Honorable George H. Sheppard, page 8

"(e) Unless this provisions is waived in writing by the Contracting Officer, reduce to writing every contract in excess of Two Thousand Dollars ($2,000.00) made by it for the purpose of the work hereunder for services, materials, supplies, machinery or equipment, or for the use thereof; insert therein a provision that such contract is assignable to the Government; make all such contracts in its own name, and not bind or purport to bind the Government or the Contracting Officer thereunder."

The foregoing special and general provisions relate to the construction of the new plant. With reference to the construction of "Emergency Plant Facilities" under Title VI of the Contract, we find the following provisions contained in Appendix A, incorporated therein by reference:

"The Final Cost Certificate or any amendment thereof, or any additional Final Cost Certificate provided for in Article VI-F of Title VI hereof shall include, the following costs and expenses incurred by the Contractor in the construction or acquisition of such facilities:

"(a) All labor and materials, tools, machinery, equipment, designs, plans, specifications, supplies, services, power, steam, fuel, and water supplies necessary for either temporary or permanent use for the benefit of the work.

"    *    *    *    *    .

"(j) Payments made by the Contractor under the Social Security Act (employer's contribution) and any applicable State or Local taxes, fees, or charges which the Contractor may be required on account of Title VI hereof to pay on or for any plant, equipment, process, organization, materials supplies, personnel, permits and license fees, and royalties on patents used, including those owned by the Contractor."

Under the contention of the Humble Oil and Refining Company and its various subcontractors that the above described

Honorable George E. Sheppard, page 9

contract constitutes the Company a mere purchasing agent for the
United States Government rather than an independent contractor,
our attention is directed to Article VII-8 of Title VII, providing
as follows:

"The title to all work, completed or in the course
of construction under Title II shall be in the Government.
Likewise, upon delivery at the site of the work or at an
approved storage site and upon inspection and acceptance
in writing by the Contracting Officer, title to all ma-
terials (except prime cup naphtha supplies and by-products
to be returned to Contractor's refinery), tools, machinery,
equipment and supplies, for which the Contractor shall be
entitled to be reimbursed under Title IV shall vest in
the Government. These provisions as to title being vested
in the Government shall not operate to relieve the Contract-
or from any duties imposed under the terms of this contract."

It is our opinion that the above-quoted title-taking
arrangement does not change the fundamental relation between the
parties of independent contractor and builder, established by
the foregoing provisions and features of the Contract. On the
contrary, this very feature, relied upon by the Contractor to
constitute it a Federal Agency or instrumentality so as to es-
cape taxation by the State, may, and to our mind does, furnish
an argument that such agency was not created by the other pro-
visions of the Contract; because if the Humble Oil & Refining
Company, was, under all the obligations and provisions of the
Contract construed together, merely an agent of the United
States, then would it not be a futile and meaningless gesture
to provide that title to the work under construction and mater-
ials going into the job, should vest in the Government? If
the relationship contended for by the Humble Oil and Refining
Company exists, then title to such property and material
would, under established principles of the law of Agency, be
vested in the United States, as principal, without any contract-
ual provisions to this effect, and without title ever passing
to or resting in said Contractor.

Moreover, in connection with this title-passing feature
of the Contract, we specifically point to that provision thereof
above quoted, that "these provisions as to title being vested
in the Government shall not operate to relieve the Contractor
from any duties imposed under the terms of this contract."
These duties are necessarily those imposed upon the Contractor,

Honorable George H. Sheppard, page 10

as "independent contractor," so designated by the parties, to construct the plant in question in accordance with the terms of the contract, some of which have been mentioned. As an illustration of this, we point to the requirement that the Contractor must arrange for "public liability, employer's liability, workmen's compensation, insurance," etc., which is inconsistent with the theory that the Contractor here is a mere agent for the United States.

The better explanation of the title-taking provision seems to be that it was inserted in the Contract by the Government in an effort to minimize substantial insurance costs through its assumption of the risk of loss of such materials. The principle of non-insurance of Government property is well established. Without this arrangement whereby title would vest in the Government at the time possession of the materials passed from the seller to the Contractor, large insurance charges would be reimbursable to the Contractor as part of the costs of material.

If the above-stated provisions of the Contract, along with others too numerous to mention, establish the relationship of the parties thereto as that of independent contractor and owner (and in our opinion they do), then it follows, under the decisive case of Trinityfarm Construction Company vs. Grosjean, 291 U.S. 466, 54 Sup. Ct. 469, 78 L.Ed. 918, that the non-discriminatory cement tax levied by Article 7047 (410a), Vernon's Annotated Revised Civil Statutes of Texas, upon the Lone Star Cement Corporation, as "distributor" under statutory definition, upon the sale of cement by it to The Humble Oil & Refining Company, as an independent contractor, or sought to be, would not be an unconstitutional burden upon the United States of America or an agency or instrumentality thereof, even though the amount of such tax became a part of the construction cost and was passed on to the Government by the Contractor as a reimbursable item of the net cost of material going into the job. This case involved the imposition of a state excise tax on gasoline consumed by a contractor with the United States for the construction of levees on the Missippi River, and the court held:

"The power granted by the commerce clause is undoubtedly broad enough to include construction and maintenance of levees in aid of navigation of the Mississippi River and to authorize the performance of the work directly by government officers

Honorable George H. Sheppard, page 11

and employees or pursuant to contracts such as those awarded to appellant. The latter method was chosen and the validity of the challenged tax is to be tested on that basis. It is not laid upon the choice of means, the making of the contracts, the contracts themselves, or any transaction to which the federal government is a party or in which it is immediately or directly concerned. Nor is the exaction laid or dependent upon the amounts, gross or net, received by the contractor. The exaction in respect of its relation to the Federal undertaking is wholly unlike those considered in Choctaw, O. & G. R. Co. v. Harrison, 235 U. S. 292, 59 L. Ed. 234, 35 S. Ct. 27; Indian Territory Illuminating Oil Co. v. Oklahoma, 240 U. S. 522, 60 L. Ed. 779, 36 S. Ct. 453; and Gillespie v. Oklahoma, 257 U. S. 501, 66 L. Ed. 338, 42 S. Ct. 171. Appellant is an independent contractor. Casement v. Brown, 148 U. S. 615, 622, 37 L. Ed. 582, 585, 13 S. Ct. 672. It is not a government instrumentality. Cf. Metcalf v. Mitchell, 269 U. S. 514, 70 L. Ed. 384, 46 S.Ct. 172; Group No. 1 Oil Corp. v. Bass, 283 U.S. 279, 75 L. Ed. 1032, 51 S. Ct. 432. Unquestionably, as appellant here concedes, Louisiana is free to tax the machinery, storage tanks, tools, etc., that are used for the performance of the contracts. These things are closely connected with the work as is the gasoline in respect of which is laid the excise in question. There is no room for any distinction between the plant so employed and the gasoline used to generate power. If the payment of state taxes imposed on the property and operations of appellant affects the federal government at all, it at most gives rise to a burden which is consequential and remote and not to one that is necessary, immediate or direct. Thomas v. Gay, 169, U. S. 264, 275, 42 L. Ed. 740, 477, 18 S. Ct. 340; Metcalf v. Mitchell, supra (269 U. S. 524, 70 L. Ed. 392, 46 S. Ct. 172); Wheeler Lumber Bridge & Supply Co. v. United States, 281 U. S. 572, 579, 74 L. Ed. 1047, 1051, 50 S. Ct. 419. Appellant's claim of immunity is without foundation."

Subsequently, in the case of James v. Dravo, Contracting Company, 302 U.S. 134, 58 S. Ct. 208, 82 L.Ed. 155, the Supreme Court of the United States went even further in restricting the doctrine of implied governmental immunity from state excise taxes by holding that an occupation tax, measured by gross income, is not invalid where imposed by a state upon a contractor with the

Honorable George H. Sheppard, page 12

United States, as laying a direct burden on the Federal Government, even though the imposition of the tax may increase the cost to the government of the work contracted to be done. The cases of Panhandle Oil Company v. Mississippi, 277 U.S. 218, 72 L. Ed. 857, 48 S. Ct. 451; Indian Motorcycle Company v. United States, 283 U. S. 70, 75 L. Ed. 1277, 51 S.Ct. 601; and Graves v. Texas Company, 298 U. S. 393, 80 L.Ed. 1236, 56 S. Ct. 818, usually referred to by the Comptroller General of the United States in his decisions with respect to the exclusion of state excise taxes in connection with standard government contracts, were by the decision in this case severely limited, if not distinguished out of existence.

But it may be pointed out that the contract involved in the instant inquiry is of the type designated as a "cost plus" contract while the contract involved in each of the two Supreme Court decisions discussed above, appears to have been what is termed a "lump sum contract," that is to say, a contract let upon competitive bidding for a stated and fixed lump sum, which would include not only the cost of labor and materials, but the profit of the contractor, and without any division of the profit from the cost of the job. It is our opinion that this distinction does not destroy or impair the authority of the cited cases and that in determining whether the status of an independent contractor is created by the instrument, it makes no difference whether the contract is a "lump sum contract" or a so-called "cost plus" contract. This conclusion is supported by the following cases involving "cost plus" contracts but nevertheless holding that a status of independent contractor was thereby created. Morgan v. Smith, 159 Mass. 520, 35 N.E. 101; Whitney Starrette & Co. v. O'Rourke, 172 Ill. 177, 50 N.E. 242; Carlton v. Foundry and Machine Products Co., 199 Mich, 148, 165 N.W. 816; Baumann v. West Allis, 187 Wis. 506, 204 N. W. 907; J. B. McCrary Engineering Co. v. White Coal Power Co., 35 F(2) 142; Crown City Lodge v. Industrial Accident Commission, 51 P(2) 143; Allen v. Republic Building Co., 84 S.W. (2d) 506.

In the case of Carlton vs. Foundry and Machine Products Company, et al, supra, we find the following pertinent statement:

"* * * We may take judicial notice that the arrangement of paying cost, plus a percentage as a contract price for a completed job, is growing in favor, and is becoming a common plan adopted by contractors in place of a lump sum payment. The federal government has let contracts involving

Honorable George N. Sheppard, page 13

the expenditure of enormous sums of money on this plan. The change is only in the method of computing payment. There is no change in the relation of the parties from that which exists where the payment is a lump sum. The manner of computing payment for the completed jobiis not controlling; a change in this regard does not convert an independent contractor into an employe, either at common law or within the meaning of the act."

There are two general classes of "cost-plus" contracts. One class is generally known as "cost-plus-a-percentage" contracts, wherein the fee or profit of the contractor is made dependent upon the cost of the work and is a fixed percentage thereof; and the other is known as "cost-plus-a-fixed-fee" contracts, wherein the contractor's compensation is not affected by variations in the cost of the job, but is in a fixed amount; altered only by changes in the scope of the work. The Contract under consideration here is of the latter type, while the cases cited immediately above involved the former type of "cost-plus" contract. But we do not believe that the method of computing the contractor's compensation under "cost-pous" contracts has any bearing whatsoever in determining whether such contractor is an independent contractor under the other terms and obligations of the contract.

The only authority we have found upon the type of "cost-plus" contract involved here, that is, the "cost-plus-a-fixed-fee" contract, and also one including the provision, hereinabove discussed, for the passage of title to the United States to materials furnished by the contractor, is the case of Standard Oil Company vs. Lee, et al, 199 So. 425, decided December 20, 1940, by the Supreme Court of Florida. We quote from the concurring opinion of Justice Whitfield, since withdrawn only in order that pertinent facts may appear which are not stated in the main opinion of the court:

"In this case the contractors are not to receive a stated sum as the contract amount to include their profits as well as their output so that such profits may cover State taxes paid by them on purchases of gasoline used under the contracts as in Trinityfarm Construction Co. v. Grosjean, 291 U. S. 466, and similar cases; but the contractors here are to receive only the actual net cost less all discounts etc., of all material and all labor employed under the contracts (except stated central office expenses, etc., of the contractors) 'plus-a-fixed-fee amount to' a stated sum for

Honorable George H. Sheppard, page 14

their time, experience, business connections, responsibility, services, etc., etc., in the performance of the contracts. The sales of material in this case are in effect made to the contractors for the United States, delivery being made at the Naval air station of the United States, and title passes to the United States and the gasoline is consumed in its use for the United States. The tax is paid by the dealer and specifically passed on to the consumer."

Additionally, it may be pointed out that like the contract before us, the contract before the court in this case contained an agreement on the part of the Government to reimburse the Contractor for all out-of-pocket expenditures of the contractor for materials, including state or local taxes.

The court held that the tax valid and constitutional notwithstanding the tax would ultimately fall on the Federal Government, since the contractors did not perform any governmental function and the burden on the Federal Government was consequential and remote.

It is not clear from the language of the opinion in this case whether the tax was upheld solely upon the theory that the contractor was an independent contractor rather than an agent of the Government or upon the ground that the Government, by the express assumption in the contract, of state and local taxes as an item of reimbursable costs to the contractor, waived its constitutional immunity from taxation. But upon either or both of such theories, we consider this case to be "on all-fours" with the situation here presented. The controlling facts appear to be identical and both theories upon which a state tax levy may be constitutionally sustained are present, viz., (1) the commodity upon which the tax is levied is sold to an independent contractor rather than an agency of the Government or, (2) alternately, if the contract here does not create the status of independent contractor, nevertheless the Government has expressly waived its implied constitutional immunity from state taxation on the face of a contract, executed under an enabling act of Congress (Act of July 2, 1940, Public No. 703, 76th Congress) which does not provide exemption from state and local taxation.

In this connection and as indicative of the intent of Congress it might be pointed out that similar acts authorizing these negotiated contracts for the National Defense (Public No. 63, 76th Congress and Public No. 888, 76th Congress) were finally

Honorable George H. Sheppard, page 15

passed without any provision exempting such contractors from state and local taxes, although such exemption clauses appeared in the bill upon introduction or by amendment, but were stricken, (Congressional Record, June 4, 1940, page 11,401.)

In view of these considerations and authorities, we advise you that you may proceed to call upon the Lone Star Cement Corporation for payment of the tax accruing under Article 7047 (41a), Vernon's Annotated Revised Civil Statutes on the sale of cement by it to the Humble Oil & Refining Company, as independent contractor with the United States of America, or to any of its subcontractors in the construction of the described project. It follows from this, without further discussion, that said tax is likewise collectible under the three distinct factual situations described in the quoted letter to you from the Lone Star Cement Corporation.

Trusting that the foregoing fully answers your inquiry, we are

Yours very truly

ATTORNEY GENERAL OF TEXAS

By
s/ Pat M. Neff, Jr.
Assistant

PMN:js

APPROVED FEB 21, 1941
s/ Gerald C. Mann
ATTORNEY GENERAL OF TEXAS

APPROVED OPINION COMMITTEE BY BWB CHAIRMAN